

1  John J. Edmonds (SBN 274200)
2  COLLINS, EDMONDS & POGORZELSKI, PLLC
   1851 East First Street, Suite 900
3  Santa Ana, California 92705
4  (951) 708-1237
   (951) 824-7901 (fax)
5

6  Attorney for Plaintiff,
   **GLOBALMEDIA GROUP, LLC**
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10  GLOBALMEDIA GROUP, LLC,          **CV11    0778**

11                                    Case No. _____
        Plaintiff,
12
13  vs.                              **COMPLAINT/APPLICATION TO
                                     COMPEL ARBITRATION, AND
                                     REQUEST FOR HEARING AND
14  LOGITECH, INC.                   EXPEDITED RELIEF**

15         Defendant.

16

17       Plaintiff    GlobalMedia    Group,    LLC    ("GlobalMedia")    files    this

18  complaint/application to compel arbitration, and request for hearing and expedited

19  relief, against Logitech, Inc. ("Logitech") as follows:

20                            **INTRODUCTION**

21       GlobalMedia and Logitech are parties to a Settlement and License Agreement

22  dated December 31, 2001 (the "Agreement"). *See* Exhibit 2.[1] The Agreement concerns

23  U.S. Patent No. 5,855,343, entitled "Camera Clip" (the "'343 patent"). *See* Exhibit 3.

24       The Agreement requires Logitech to pay royalties for "Licensed Products." The

25  parties have a dispute over which of Logitech's products are Licensed Products, and

26  thus over the amount of royalties owed by Logitech to GlobalMedia under the

27  ―――――――――――――――
[1] Due to the confidential nature of the Agreement, Exhibit 2 is a redacted version
28  thereof.

Agreement.

Efforts to resolve this dispute have reached an impasse, and thus GlobalMedia has requested arbitration per the Agreement. The Agreement sets forth a process for appointing an arbitrator. GlobalMedia has proposed a respected, qualified arbitrator, Mr. Thomas Smegal. However, Logitech has not agreed for Mr. Smegal to serve as arbitrator, nor has Logitech proposed any alternatives. Logitech merely denies that arbitration is appropriate because Logitech disputes the merits of GlobalMedia's claim.

Logitech's disregard of the arbitrator appointment process serves to frustrate the entire agreed arbitration process. The Agreement provides that if, as here, the parties are unable to agree upon an arbitrator, then either party may apply for the court to appoint one. Accordingly, GlobalMedia respectfully requests this Court to enter an order appointing Mr. Smegal as arbitrator, and further directing that arbitration shall proceed.

## PARTIES

1.     Plaintiff GlobalMedia is a limited liability company organized and existing under the laws of the state of Arizona with its principal place of business at 15020 North 74th Street in Scottsdale, Arizona.

2.     Upon information and belief, defendant Logitech is a corporation existing and organized under the laws of California with its principal place of business at 6505 Kaiser Drive in Fremont, California.

## JURISDICTION AND VENUE

3.     This Court has diversity jurisdiction over this controversy pursuant to 28 U.S.C. § 1332, *et seq*. There is complete diversity of citizenship among the parties. GlobalMedia is an Arizona limited liability company, and GlobalMedia's principal place of business is in Scottsdale, Arizona. Logitech is a California corporation, and its principal place of business is in Fremont, California. In addition, the amount in controversy exceeds $75,000 exclusive of interests and costs. Based upon available

information, GlobalMedia's claim for underpaid royalties against Logitech amounts to millions of dollars.

4.     Additionally, or in the alternative, GlobalMedia has a good faith belief to assert that this court has federal question jurisdiction over this action because it arises under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.* GlobalMedia contends in good faith that this case arises under the Patent Act because, although a contract dispute on its face, it involves right to relief which depends on the scope of the '343 patent, and thus it involves resolution of a substantial question of federal patent law. *See, e.g., Warrior Sports, Inc. v. Dickinson Wright, PLLC*, ___ F.3d ___, 2011 WL 95332 at *3 (Fed. Cir. 2011). Thus, although diversity jurisdiction is clear and undisputable, GlobalMedia alternatively contends that this court has federal question jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1338 and/or 1441.

5.     Logitech is subject to this Court's specific jurisdiction because multiple acts and omissions at issue (*e.g.*, the non-payment of royalties and the failure to abide by the parties' agreement to arbitrate) occurred in and from California. In addition, Logitech is subject to this Court's general jurisdiction, including because it is a California corporation, its headquarters are in California, and it does continuous and systematic business in California. In addition, paragraph 7.10 of Agreement has a forum selection clause naming this judicial district.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and/or (d), including because Logitech resides, and is subject to personal jurisdiction, in this district; and a substantial part of the events or omissions giving rise to this action occurred in this district. In addition, paragraph 7.10 of Agreement has a forum selection clause naming this judicial district.

## FACTUAL SUMMARY

7.     This complaint/application concerns the Agreement at Exhibit 2 hereto. The Agreement is nominally between PAR Technologies, Inc. ("PAR") and Logitech.

However, GlobalMedia is the undisputed successor to PAR. In fact, Logitech has previously paid certain royalties to GlobalMedia, as PAR's successor, under the Agreement (although such royalty payments are deficient, which is the crux of the dispute between the parties).

8.     The Agreement provided for the settlement of two patent infringement lawsuits, both of which concerned the '343 patent. One lawsuit was styled *PAR Technologies v. Logitech*, No. 01-1273, in the U.S. District Court for Arizona. In the Arizona lawsuit, PAR contended that Logitech infringed the '343 patent. The other lawsuit was styled *Logitech v. PAR Technologies*, No.CV-01-1982, and it was filed in this judicial district. In the California lawsuit, Logitech requested a declaration that it did not infringe the '343 patent, and that the patent was invalid.

9.     The '343 patent covers certain novel configurations of devices which are commonly referred to as webcams. *See* Exhibit 3. The Agreement requires Logitech to pay GlobalMedia certain royalties for "Licensed Products," which are defined in paragraph 1.6 as "any device manufactured by or for Logitech and/or its Affiliates which may be covered by the ''343 patent."

10.     The parties have a dispute over royalties payable under the Agreement. GlobalMedia has identified multiple webcams which it deems to be Licensed Products, but for which Logitech has not paid royalties. In addition, in order to determine the amount of royalty underpayment, GlobalMedia has requested an audit under paragraph 3.5 of the Agreement. Logitech disputes that the webcams at issue are royalty bearing Licensed Products, and Logitech refuses to pay royalties on them. In addition, Logitech has refused the requested audit.

11.     Article 6 of the Agreement provides for a dispute resolution procedure which includes binding arbitration. Efforts to resolve this dispute amicably have reached an impasse, and thus on February 8, 2011, GlobalMedia provided written notice to Logitech requesting arbitration pursuant to paragraph 6.1 of the Agreement.

- 4 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12.     Paragraph 6.2 of the Agreement provides for appointment of an arbitrator, who must have substantial experience and expertise in patent law. The preferred method for appointing an arbitrator is for the parties to agree upon one. In its February 8, 2011 letter, GlobalMedia proposed an arbitrator, Mr. Thomas Smegal. Mr. Smegal is a seasoned and well respected litigator and arbitrator. Further, as evidenced by Mr. Smegal's bio at Exhibit 4, he has substantial experience and expertise in patent law.

13.     To date, Logitech has not disputed Mr. Smegal's qualifications to serve as arbitrator. Rather, continuing a dilatory course of behavior, Logitech has neither agreed for Mr. Smegal to serve as arbitrator, nor has Logitech proposed any alternatives. Logitech denies that arbitration is appropriate for a long list of excuses, which appear centered around its dispute of the merits of GlobalMedia's claim. Among other things, Logitech denies that the webcams at issue qualify as Licensed Products.

14.     In sum, Logitech refuses to permit an audit of its webcam sales, it refuses to agree upon an arbitrator, and it refuses arbitration, which is the sole forum for holding Logitech accountable for underpayment. Logitech appears to think that it can pay whatever royalties it sees fit, and then stick its head in the sand to avoid being held accountable for its actions.

15.     Paragraph 6.2 further provides that if, as here, the parties are unable to agree upon an arbitrator, then either party may apply to the court to request appointment of one. Regrettably the parties are unable to agree upon an arbitrator. Accordingly, GlobalMedia respectfully requests this Court to enter an order appointing Mr. Smegal as arbitrator, and further compelling Logitech to participate in the agreed arbitration process.

16.     Although Logitech's dispute of liability under the Agreement is meritless, it is a matter that can, and should, be resolved by the arbitrator via the agreed arbitration process.

- 5 -

1

2

# CLAIMS FOR RELIEF

3

4

## I. APPLICATION TO COMPEL ARBITRATION UNDER THE FAA

5       17.    The foregoing factual summary is incorporated by reference.

6       18.    Pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*,

7   this Court should appoint Mr. Thomas Smegal as arbitrator,[2] and the Court should

8   compel Logitech to arbitrate this dispute.

9       19.    The FAA provides that a "written provision in ... a contract evidencing a

10   transaction involving commerce to settle by arbitration a controversy thereafter arising

11   out of such contract or transaction ... shall be valid, irrevocable, and enforceable." 9

12   U.S.C. § 2. A party aggrieved by the alleged failure, neglect, or refusal of another to

13   arbitrate under a written agreement for arbitration may petition a court for an order

14   directing that such arbitration proceed in the manner provided for in such agreement.

15   *Id.* at § 4.

16       20.    If in the agreement provision be made for a method of naming or

17   appointing an arbitrator or arbitrators or an umpire, such method shall be followed. *Id.*

18   at § 5. However, if there is a lapse in the naming an arbitrator, then upon the

19   application of either party to the controversy, the court shall designate and appoint an

20   arbitrator as the case may require, who shall act under the said agreement with the

21   same force and effect as if he or they had been specifically named therein. *Id.*

22       21.    The FAA espouses a general policy favoring arbitration agreements. *See*

23   *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 24-25, 103 S.Ct. 927

24   (1983); *see also Hall Street Assoc. v. Mattel*, 552 U.S. 576, 581, 128 S.Ct. 1396

25   (2008). Thus, federal courts are required to rigorously enforce an agreement to

26

27   [2] Alternatively, should the Court not deem Mr. Smegal to be the appropriate arbitrator
     for this matter, this Court should appoint an arbitrator of its choosing pursuant to
28   Section 6.2 of the Agreement and/or Section 6 of the FAA.

- 6 -

arbitrate. *See Hall Street Assoc.*, 552 U.S. at 582.

22. In determining whether to issue an order compelling arbitration, the court may not review the merits of the dispute but must limit its inquiry to (1) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, (2) whether there exists a valid agreement to arbitrate, and (3) whether the dispute(s) fall within the scope of the agreement to arbitrate. *See Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477-478 (9th Cir.1991), *cert. denied*, 503 U.S. 919 (1992). If the answer to each of these queries is affirmative, then the court "must" order the parties to arbitration in accordance with the terms of their agreement. 9 U.S.C. § 4.

23. This Court should appoint an arbitrator in accordance with Paragraph 6.2 of the Agreement, and it should compel Logitech to arbitrate this royalty dispute with GlobalMedia. The Agreement evidences a transaction involving interstate commerce, which includes the settlement of two federal patent infringement lawsuits which were pending in Arizona and California, and also Logitech's nationwide sales of what are believed to be millions of royalty bearing webcams. Further, it is indisputable that Article 6 of the Agreement constitutes a valid agreement to arbitrate.

24. Finally, this royalty dispute clearly falls within the scope of the agreement to arbitrate. This dispute concerns whether certain Logitech webcams fall within the definition of "Licensed Products," and Paragraph 6.1 of the Agreement provides that the parties shall arbitrate "any disputes that may arise under this Agreement, including but not limited to disputes whether a product falls within the definition of a Licensed Product."

25. Accordingly, pursuant to the FAA, this Court "must" order the parties to arbitration in accordance with the terms of their Agreement. *See* 9 U.S.C. § 4.

## II. (ALTERNATIVELY) APPLICATION TO COMPEL
## ARBITRATION UNDER THE CAA

1.      The foregoing factual summary is incorporated by reference.

2.      Although the FAA clearly applies to, and should govern disposition of this matter, to the extent the Court might deem the FAA as inapplicable, the California Arbitration Act (the "CAA"), Code Civ. Proc. § 1281, *et seq*., provides an alternative basis for this Court to appoint Mr. Smegal as arbitrator, [3] and to compel Logitech to arbitrate this dispute.

3.      A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable. *Id*. at § 1281. On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court "shall" order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists. *Id*. at § 1281.2.

4.      If the arbitration agreement provides a method of appointing an arbitrator, that method shall be followed. *Id*. at § 1281.6. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator. *Id*.

5.      The CAA represents a comprehensive statutory scheme regulating private arbitration in this state. *Haworth v. Superior Court*, 50 Cal.4th 372, 380, 235 P.3d 152 (2010). The statutory scheme reflects a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution. *Id*.

6.      As noted above, it is indisputable that Article 6 of the Agreement

---

[3] Alternatively, should the Court not deem Mr. Smegal to be the appropriate arbitrator for this matter, this Court should appoint an arbitrator of its choosing pursuant to Section 6.2 of the Agreement.

constitutes a valid agreement to arbitrate. Further, this royalty dispute clearly falls within the scope of the agreement to arbitrate. Accordingly, under the alternative basis of the CAA, this Court "shall" order the parties to arbitrate this controversy.

## REQUEST FOR HEARING AND EXPEDITED RELIEF

7.     Logitech has no legitimate excuse to avoid arbitration. It merely seeks delay.   Consistent with the strong national policy favoring arbitration, the FAA provides for expedited judicial procedures when arbitration is being avoided. As provided in the FAA, "[a]n application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6. In that regard, at least "[f]ive days' notice in writing of an application for arbitration shall be served upon the party in default." *Id.* at § 4. Then, the "court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*

8.     Alternatively, consistent with the strong state public policy favoring arbitration, the CAA provides for expedited judicial procedures when arbitration is being avoided. As provided in the CAA, "[a] petition under this title shall be heard in a summary way in the manner and upon the notice provided by law for the making and hearing of motions, except that not less than 10 days' notice of the date set for the hearing on the petition shall be given."

9.     Accordingly, GlobalMedia respectfully requests that this Court convene a hearing, on an expedited basis, to determine whether this matter should be arbitrated, at such time as the Court's docket permits.

- 9 -

1

## **PRAYER FOR RELIEF**

2

Wherefore, GlobalMedia prays for judgment and an order, on an expedited basis:

3

(a)    that Mr. Thomas Smegal shall serve as arbitrator for this dispute (or,

4

alternatively, that another court-appointed arbitrator shall be appointed);

5

(b)    directing that arbitration proceed, and that Logitech be compelled to arbitrate

6

this dispute;

7

(c)    that GlobalMedia be awarded its attorney's fees and costs of court; and

8

(d)    that GlobalMedia be awarded such other and further relief as the Court

9

deems just and proper.

10

11

Dated:   February 21, 2011            Respectfully submitted,

12

13

14

John J. Edmonds (SBN 274200)

15

COLLINS, EDMONDS &
POGORZELSKI, PLLC

16

1851 East First Street, Suite 900
Santa Ana, California 92705

17

(951) 708-1237

18

(951) 824-7901 (fax)

19

Attorney for Plaintiff,

20

GLOBALMEDIA GROUP, LLC

21

22

23

24

25

26

27

28

- 10 -

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLOBALMEDIA GROUP, LLC,

      Plaintiff,

vs.

LOGITECH, INC.

      Defendant.

**DECLARATION OF JOHN EDMONDS IN SUPPORT OF GLOBALMEDIA'S COMPLAINT/APPLICATION TO COMPEL ARBITRATION, AND REQUEST FOR HEARING AND EXPEDITED RELIEF**

John J. Edmonds states as follows:

I am the counsel of record for GlobalMedia Group, LLC ("GlobalMedia") in the above-referenced matter. I am over the age of 18 and I am fully competent to make this declaration. I have personal knowledge of the facts stated herein from my work on this matter.

1.    Exhibit 2 to GlobalMedia's COMPLAINT/APPLICATION TO COMPEL ARBITRATION, AND REQUEST FOR HEARING AND EXPEDITED RELIEF (the "Complaint/Application") is a redacted version of the Settlement and License Agreement between PAR Technologies, Inc. ("PAR") and Logitech, Inc. ("Logitech") dated December 31, 2001 (the "Agreement").

2.    GlobalMedia is the successor to PAR with respect to the Agreement. In a September 2, 2002 "License and Distribution Agreement" involving Logitech, PAR and GlobalMedia, Logitech acknowledged GlobalMedia's successorship to PAR, and also ratified the Agreement. Over multiple years, including in 2010, Logitech has made royalty payments to GlobalMedia pursuant to the Agreement (although the sufficiency of those payments is now disputed).

3.    As noted in the recitals on page 1, the Agreement provided for the settlement of two patent infringement lawsuits, both of which concerned

- 1 -



3.   As noted in the recitals on page 1, the Agreement provided for the settlement of two patent infringement lawsuits, both of which concerned the '343 patent. One lawsuit was styled *PAR Technologies v. Logitech*, in the U.S. District Court for Arizona. In the Arizona lawsuit, PAR contended that Logitech infringed the '343 patent. The other lawsuit was styled *Logitech v. PAR Technologies*, and it was filed in the U.S. District Court for the Northern District of California. In the California lawsuit, Logitech requested a declaration that it did not infringe the '343 patent, and that the patent was invalid.

4.   Global Media and Logitech have a dispute over, *inter alia,* royalties payable under the Agreement. GlobalMedia has identified multiple webcams which it deems to be Licensed Products, but for which Logitech has not paid royalties. In addition, in order to determine the amount of royalty underpayment, GlobalMedia has requested an audit. Based upon available information, GlobalMedia believes and contends that this dispute over Licensed Products involves millions of webcams and millions of dollars of unpaid royalties.

5.   Among other things, Logitech has disputed that the webcams at issue are royalty bearing Licensed Products, and Logitech indicated its refusal to pay royalties on them. In addition, Logitech has refused the requested audit.

6.   Efforts to resolve this dispute amicably have reached an impasse, and thus on February 8, 2011, GlobalMedia provided written notice to Logitech requesting arbitration pursuant to Article 6 of the Agreement.   In its February 8, 2011 letter, GlobalMedia proposed an arbitrator, Mr. Thomas Smegal. A true copy of Mr. Smegal's bio from http://smegallaw.com is at Exhibit 4 to the Complaint/Application.

7.   To date, Logitech has not agreed to Mr. Smegal serving as arbitrator, nor has Logitech proposed any alternatives.   In addition, Logitech has indicated no willingness to arbitrate.   Further, Logitech has refused to permit the requested audit.

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4    Executed on February 21, 2011at Houston, Texas.

5

6

7                                   John J. Edmonds

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

## Logitech and PAR Technologies
## Settlement and License Agreement

**ORIGINAL**

This Settlement and License Agreement ("Agreement") is made and entered into as the date of the last signature appearing below ("Effective Date"), by and between PAR Technologies, Inc., having a place of business in Scottsdale, Arizona ("PAR Technologies"), and Logitech Inc. ("Logitech"), having a place of business in Fremont, California. PAR Technologies and Logitech shall be collectively referred to as the "Parties" and may be individually referred to as a "Party."

### Recitals

WHEREAS, there is a lawsuit currently pending in the United States District Court for the District of Arizona between PAR Technologies and Logitech (Civil Action No. Civ. 01-1273) ("the PAR Action") for alleged infringement of United States Patent No. 5,855,343 ("the '343 patent; entitled "Camera Clip" issued on January 5, 1999, and a civil action currently pending in the United States District Court for the Northern District of California titled Logitech Inc. v. PAR Technologies, Inc. (Case Number CV-01-1983) seeking declaratory judgment of non-infringement and invalidity of the '343 patent (the "Logitech Action") (collectively the "Lawsuits");

WHEREAS, this Agreement relates to the '343 patent together with all continuations, continuations-in-part, divisions, reexaminations and reissues thereof;

WHEREAS, Logitech desires to obtain a non-exclusive license under the '343 patent and PAR Technologies desires to grant such a license;

WHEREAS, the parties seek an amicable and final business resolution and settlement of any and all claims relating to the '343 patent, including all claims which were or could have been asserted in the PAR Action, on the terms and conditions set forth below;

NOW, THEREFORE, in accordance with the foregoing recitals and in consideration of the mutual covenants contained herein, PAR Technologies and Logitech agree as follows:

### Article 1 – Definitions



### Logitech and PAR Technologies
### Settlement and License Agreement

1.6    "Licensed Products" means any device manufactured by or for Logitech and/or its Affiliates which may be covered by the '343 patent including, but not limited to the Logitech SmartClip, and nor including the Kritter Design.

**Article 2 – Settlement and Release**

**Logitech and PAR Technologies**
**Settlement and License Agreement**

**Article 3 – License and Payment**

## Logitech and PAR Technologies
### Settlement and License Agreement

3.2     PAR Technologies grants to Logitech and its Affiliates a worldwide, non-exclusive, license under the '343 patent to make, have made, use, lease, sell, offer to sell, import, export, distribute and otherwise dispose of Licensed Products sold by Logitech and/or its Affiliates. The term of the foregoing license ("Term") shall initially be for a period of 10 years, at the royalty rates set forth below for each Licensed Product that Logitech and/or its Affiliates makes, uses, sells, or offers to sell in a country or countries in which the '343 patent has issued to PAR Technologies, less any returns. The Term of the foregoing license shall be extended for the life of the '343 patent, which will expire on March 07, 2017, subject to Sections 4.1 and 4.2.

| Total aggregate amount of royalties paid by Logitech and its Affiliates: | Royalty rate per unit of Licensed Product: |
|---|---|
| | per unit |
| | per unit |
| | per unit |
| | per unit |

3.5     Logitech shall keep accurate records and books of account containing data reasonably required for the verification of the quantity of Licensed Products made and/or sold by Logitech and its Affiliates during the Term of the '343 patent license. Logitech agrees to allow an independent auditor to inspect such records and books of account no more than once per year during the Term, at Logitech's normal place of business during reasonable business hours upon at least thirty (30) days advance written notice to Logitech for purposes of verifying the accuracy of royalties paid to PAR Technologies. Logitech agrees to pay the costs of the audit in the event the auditor discovers an underpayment by Logitech in excess of five percent (5%); otherwise, PAR Technologies shall pay the costs of any such audit. The auditor shall agree to maintain the confidentiality of any confidential information learned about Logitech and shall only disclose to PAR Technologies the actual quantity of Licensed Products made and/or sold by Logitech and its Affiliates.

**Logitech and PAR Technologies**
**Settlement and License Agreement**

Article 4 – Distribution Agreement or Additional License Fee

Article 5- Representations

**Article 6 – Dispute Resolution**

6.1 Arbitration. Each Party will make good faith efforts to amicably resolve any disputes that may arise under this Agreement, including but not limited to disputes regarding whether a particular product falls within the definition of a Licensed Product. However, in the event the parties are unable to amicably resolve any such dispute within thirty (30) days, either Party may provide the other Party with written notice requesting that the matter be settled by arbitration in the Northern District of California.

6.2 Arbitration Procedure. There will be one (1) arbitrator chosen by mutual agreement of the Parties. In the event the Parties cannot agree to the arbitrator within ten (10) business days after referral of the matter to arbitration, either Party may apply to the court and request appointment of an

## Logitech and PAR Technologies
## Settlement and License Agreement

arbitrator. The Parties agree that any arbitrator chosen or appointed must have substantial experience and expertise in patent law. Each Party will have the right to conduct the following limited discovery: (i) up to ten (10) requests for production of documents, (ii) the depositions of up to three (3) individuals; (iii) up to twenty (20) written interrogatories; and (iv) up to ten (10) requests for admission. The arbitrator will supervise discovery and may, on request of either Party, authorize additional discovery in the arbitrator's discretion in order to avoid injustice. The decision of the arbitrator shall follow applicable substantive law and set forth in writing the findings of fact and law and the reasons supporting the decision. Such decision shall be final and binding upon the Parties.

6.3    Injunctive Relief. Notwithstanding the provisions of this Article 6, the Parties may apply to any court of competent jurisdiction for injunctive relief without breach of this dispute resolution article.

### Article 7 - General Provisions

**Logitech and PAR Technologies**
**Settlement and License Agreement**

7.0   The validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to any choice of law principles. Any action brought to enforce the terms of this Agreement shall be brought in the United States District Court for the Northern District of California.

## Logitech and PAR Technologies
## Settlement and License Agreement

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Agreement as of the dates set forth below.

**PAR TECHNOLOGIES, INC.**

**LOGITECH INC.**

By: _____
  (signature)
Name: _____
Title: _____

By: _____
  (signature)
Name: JUNIEN LABROUSSE
Title: SR. VP & GM VIDEO

Date: _____

Date: 12/28/2001

**Approved as to form:**

**Approved as to form:**

By: _____
  (signature)
Name: _____
Title: _____
Law Firm: _____
Date: _____

By: _____
  (signature)
Name: Kristine Riley
Title: Associate General Counsel
Date: 12/28/2001

## Logitech and PAR Technologies
## Settlement and License Agreement

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Agreement as of the dates set forth below.

**PAR TECHNOLOGIES, INC.**                    **LOGITECH INC.**

By _____              By __ ____  ___ _____
(signature)                                      (signature)
Name: _Joel  E. Barthelemy_              Name: _____ _____  _____
Title: _CEO_                                     Title: _____ _____  _____

Date _December 31, 2007_                 Date _____ ___ _____  ___

Approved as to form                       Approved as to form

By _____              By _____ _____ ___
(signature)                                      (signature)
Name _Edward G. Duckworth_               Name: _____ _____ ____
Title: _Partner_                                 Title: ____ _____ __ ___
Law Firm _Drummond & Duckworth_          Date _____ _____ ___ ___
Date _December 31, 2007_



US005855343A

# United States Patent [19]

## Krekelberg

| | |
|---|---|
| [11] | **Patent Number:** **5,855,343** |
| [45] | **Date of Patent:** **Jan. 5, 1999** |

[54] **CAMERA CLIP**

[75] Inventor: **David E. Krekelberg**, Minnetonka, Minn.

[73] Assignee: **iREZ Research, Corporation**, Minnetonka, Minn.

[21] Appl. No.: **814,168**

[22] Filed: **Mar. 7, 1997**

[51] **Int. Cl.⁶** ...................................................... **A47G 29/00**
[52] **U.S. Cl.** ......................... **248/121**; 248/126; 248/918
[58] **Field of Search** ................................... 248/121, 126, 248/440.1, 166, 176.1, 688, 918; 224/908; 396/421, 422, 423, 424, 425, 426, 427, 428

[56] **References Cited**

U.S. PATENT DOCUMENTS

1,208,344   12/1916   McAll ..................................... 248/126

*Primary Examiner*—Ramon O. Ramirez
*Assistant Examiner*—Long Dinh Phan
*Attorney, Agent, or Firm*—Nawrocki, Rooney & Sivertson, P.A.

[57] **ABSTRACT**

A clip for supporting a portable camera either on a surface or on an edge of a housing, and for protecting the lens of the camera when the camera is not being supported. The clip provides two axis of rotation to position the camera to any desired viewing angle. The clip may be rotated to a first position to support the camera on a surface of a table or desk. The clip may be rotated to a second position to support the camera on the display screen of a laptop computer. When the camera is not being supported in the first position or the second position, the camera may be rotated to be releasably held by the clip to protect the camera and lens during storage.

**21 Claims, 2 Drawing Sheets**





Case3:11-cv-00778-EMC Document1 Filed02/22/11 Page24 of 32



*Fig. 1*

*Fig. 2*

*Fig. 3*

*Fig. 4*

**U.S. Patent**     Jan. 5, 1999     Sheet 2 of 2     **5,855,343**

*Fig. 5*



*Fig. 6*

*Fig. 7*



5,855,343

**1**

# CAMERA CLIP

### FIELD OF THE INVENTION

This invention relates to a clip for holding a camera. More particularly it relates to a clip for supporting a portable camera either on a surface or on an edge of a housing, and for protecting the lens of the camera when the camera is not being supported.

### BACKGROUND OF THE INVENTION

With portable cameras, it is desirable to have an apparatus which can support the camera in any number of desired configurations. The apparatus must easily accommodate repositioning the camera to new orientations during use, and must be easily transportable. This is especially true when using the camera with a portable computer, such as a laptop computer. With increasing improvements in technology, both the laptop computer and camera have become smaller over time, emphasizing the need for a compatible camera support apparatus. The camera support apparatus must be versatile, light in weight, and be easily transportable to accommodate the new camera and laptop designs, and must desirably facilitate easy and safe storage of the camera. Often times portable computers are stored in carry bags which may be fully loaded with other hardware devices, such as disk drives or printers, as well as with personal effects, making for cramped storage conditions. The camera support apparatus must desirably protect the camera from damage during transport under these cramped storage conditions to avoid the necessity for separate storage means in order to maintain camera portability.

In the past, camera support apparatus were not easily transportable. Often times these apparatus utilized designs which incorporated a tripod approach, or which used one or more telescoping arms to support the camera. These designs attempted to support the camera during use, and then collapse to a smaller size to facilitate storage or transportation. While these designs were transportable, often times even the collapsed size of the prior art camera support apparatus could not be easily accommodated by a laptop computer bag. These prior art apparatus also did not provide means to protect the camera during transport, and if constructed of hard, exposed materials, tended to damage the cameras.

Another problem with prior art camera support apparatus was that they could not easily accommodate the variety of applications desired for portable cameras. These applications ranged from supporting the camera on the surface of a desk or table to supporting the camera on the upright display screen of a laptop computer. With the prior art, often times more than one camera support apparatus was necessary in order to support the desired range of applications. This unfortunately adversely impacted portability of the camera.

Thus, a desire was created within the industry for a small, easily transportable camera support apparatus for supporting the camera on both horizontal surfaces, such as the surface of a desk or table, and vertical surfaces, such as the display screen of a laptop computer, and to protect the camera during storage and transport.

### SUMMARY OF THE INVENTION

Accordingly, it is an object of the invention to provide a clip for supporting a portable camera either on a surface or on an edge of a housing, and for protecting the lens of the camera when the camera is not being supported. The clip provides two axis of rotation to position the camera to any

**2**

desired viewing angle. The clip may be rotated to a first position to support the camera on a surface of a table or desk. The clip may be rotated to a second position to support the camera on a display screen of a laptop computer. When the camera is not being supported in the first position or the second position, the camera may be rotated to be releasably held by the clip to protect the camera and lens during storage.

In a preferred embodiment of the present invention, an apparatus is provided for supporting a camera on an object where the apparatus comprises a hinge member and a support frame. The hinge member is rotatably attached to the camera where the camera rotates over a first axis of rotation relative to the hinge member. A support frame is hingedly attached to the hinge member to engagingly support the hinge member on the object, where the hinge member rotates over a second axis of rotation relative to the support frame. The first axis of rotation is perpendicular to the second axis of rotation, and the second axis of rotation is substantially parallel to a first surface of the object when the hinge member is engagingly supported on the object. In the preferred embodiment, the support frame further has a rear support element and first and second front support elements. In the preferred embodiment, the rear support element and the first and second front support elements support the camera in the first position on the first surface when the rear support element and the first and second front support elements are engaging the first surface when the first surface is substantially level. In the preferred embodiment, the rear support element and the first and second front support elements engage the first surface at three locations in a plane of the first surface to prevent rotation of the support frame relative to the first surface in any direction within the plane of the first surface. In the preferred embodiment, when the support frame is in the first position, the object may be the top of a table where the first surface is a top surface of the table. The object may also be a desk top where the first surface is a top surface of the desk.

In the preferred embodiment, the rear support element and the first and second front support elements support the camera in a second position on the first surface adjacent an edge when the first surface is inclined from the substantially level position. The object has a second surface wherein a thickness between the first surface and the second surface defines an edge therebetween. The camera is maintained adjacent to the edge in the second position where the uppermost portion of the object is the edge. The rear support element engages a first surface and the first and second support elements engage the edge and the second surface. The rear support element and the first and second front support elements, in combination, maintain the camera adjacent the edge and prevent rotation of the support frame along an axis substantially parallel to the second axis where the second axis is substantially parallel to the edge. In a preferred embodiment, the rear support element and the first and second front support elements support the camera in the second position on the first surface adjacent the edge when a first distance from the edge to the position where the rear support element engages the first surface is greater than a second distance from the edge to the position where the first and second front support elements engage the second surface. A center of gravity of the camera and the hinge member being adjacent and external to the first surface in combination with the first distance being greater than the second distance prevents rotation of the support frame along the axis substantially parallel to the second axis of rotation. In the preferred embodiment, when the support frame is in the

5,855,343

**3**

second position, the object may be a display screen for a laptop computer, where the second surface is the front of the display screen and the first surface is the back of the display screen.

In the preferred embodiment, the support frame has means to releasably hold and protect the camera during storage. The camera may be rotated about the second axis in a direction from the first and second front support elements towards the rear support element of the support frame until the camera is in a position between and is releasably held by the rear support element and the first and second front support elements. In the preferred embodiment, the rear support element has means to protect a lens of the camera which is a cover mounted at a distal end of the rear support element. The lens of the camera faces a direction of rotation about the second axis from the first and second front support elements to the rear support element of the support frame to allow the lens of the camera to be fitably received into the cover when the camera is releasably held between the rear support element and the first and second front support elements.

In the preferred embodiment, the first and second front support elements are spaced a distance apart at a distance less than a diameter of a housing of the camera, where the camera is rotated about the second axis in the direction towards the rear support element so that the housing passes between the first and second front support elements. The first and second front support elements resiliently and outwardly flex to accommodate passage of the housing. The housing is releasably held after passing between the first and second front support elements by the rear support element engaging the housing at the lens, where the first and second front support elements engage the housing backside at a first indentation and a second indentation respectively to resiliently urge the housing towards the rear support element.

In the preferred embodiment, the hinge member is further comprised of a body having a proximal and a distal end where a pivot element at the proximal end of the body rotatably attaches the camera to the body so that the camera rotates about the first axis relative to the body. A hinge element at the distal end of the body hingedly attaches the body to the support frame so that the body rotates about the second axis relative to the support frame. In the preferred embodiment, the camera has an electrical wiring harness to couple from an interior to an exterior of the camera, and the pivot element has a bore parallel to the first axis of rotation to receive the electrical wiring harness to pass the wiring harness from the interior to the exterior of the camera.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects of the present invention and many of the attendant advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings, in which like reference numerals designate like parts throughout the figures thereof and wherein:

FIG. 1 is a perspective view of the "Camera Clip" invention;

FIG. 2 is a side view showing a first mode of a preferred embodiment of the present invention;

FIG. 3 is a detailed front view of the "Camera Clip" invention;

FIG. 4 is a side view showing a second mode of the preferred embodiment of the present invention;

FIG. 5 is a side view showing a third mode of the preferred embodiment of the present invention;

**4**

FIG. 6 is a detailed side view showing the third mode wherein the lens of the camera is being fitably received by the cover; and

FIG. 7 is a front view showing the third mode of the preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the drawings, wherein like reference numerals refer to like elements throughout the several views, FIG. 1 is a perspective view of the camera clip invention. FIG. 1 shows generally a camera apparatus **10** having a camera **12** and a camera clip **14**. Camera clip **14** is further comprised of a hinge member **16** and a support frame **18**. Camera **12** is comprised of housing **20** and lens **22**, and has a housing backside **24** which is the side of the housing opposite of lens **22**. Hinge member **16** is rotatably attached to camera **12**, where camera **12** rotates over a first axis **26** in a direction shown by arrow **28** relative to hinge member **16**. Support frame **18** is hingedly attached to hinge member **16** to engagingly support hinge member **16** on an object **30** (see also, FIG. 2). Hinge member **16** rotates over a second axis **32** in the direction shown by arrow **34** relative to support frame **18**. First axis **26** is perpendicular to second axis **32**. Second axis **32** is substantially parallel to a first surface **36** when hinge member **16** is engagingly supported on object **30** (see also, FIG. 2). Support frame **18** has a first portion consisting of first support element **38** and a second portion consisting of a first front support element **40** and a second front support element **42**. Housing **20** has a first indentation **25** and a second indentation **27** to slidably and fittably receive distal end **41** of first front support element **40** and distal end **43** of second front support element **42** when first front support element **40** and second front support element **42** are rotated in the direction of arrow **34** to engage housing backside **24**.

FIG. 2 is a side view showing a first mode of a preferred embodiment of the present invention. Rear support element **38**, first front support element **40** and second front support element **42** support camera **12** in the first position **44**, on the first surface **36**, when rear support element **38**, first front support element **40** and second front support element **42** are engaging first surface **36** and first surface **36** is substantially level. In the first position **44**, camera **12** may be pivoted upon support frame **18** from a position **46** to a position **48**. It is recognized that camera **12** may be pivoted to any number of positions about second axis **32** in the direction shown by arrow **34**. In the preferred embodiment, rear support element **38**, first front support element **40** and second front support element **42** support the camera in first position **44**, on first surface **36**, when rear support element **38**, first front support element **40** and second front support element **42** engage first surface **36** at three locations in a plane **50** of first surface **36**. Engagement of first surface **36** at three or more locations prevents rotation of support frame **18** relative to first surface **36** in any direction within plane **50** of first surface **36**. It is understood that in the preferred embodiment, rear support element **38**, first front support element **40** and second front support element **42** may utilize any number of desired geometries to engage first surface **36** to prevent rotation of support frame **18** relative to first surface **36** in any direction within plane **50** of first surface **36**. In the preferred embodiment, when support frame **18** is in the first position **44**, the object may be a top of a table and first surface **36** may be a top surface of the table. Likewise, object **30** may be a desk top, where first surface **36** is a top surface of the desk.

FIG. 4 is a side view showing a second mode of the preferred embodiment of the present invention. The second mode occurs when rear support element 38, first front support element 40 and second front support element 42 support camera 12 in a second position 52 on a first surface 54 adjacent an edge 56. Second position 52 corresponds to first surface 54 being inclined from the substantially level position (see also, FIG. 2). In FIG. 4, object 58 has a second surface 60, where a thickness d1 between first surface 54 and second surface 60 defines the edge 56 therebetween. Camera 12 is maintained adjacent edge 56 in second position 52 when the uppermost portion of object 58 is edge 56. Rear support element 38 engages first surface 54, and first front support element 40 and second front support element 42 engage edge 56 and second surface 60. Rear support element 38, first front support element 40 and second front support element 42, in combination, maintain camera 12 adjacent edge 56 and prevent rotation of support frame 18 along an axis substantially parallel to second axis 32, where second axis 32 is substantially parallel to edge 56. Rear support element 38, first front support element 40 and second front support element 42 support camera 12 in second position 52 on the first surface 54 adjacent edge 56 when a first distance 64 measured between edge 56 and position 66 is greater than a second distance 68. Second distance 68 is measured between edge 56 and position 70, where first front support element 40 and second front support element 42 engage second surface 60. The center of gravity shown in the direction of arrow 72 of camera 12 and hinge member 16 being adjacent and external to first surface 54 in combination with first distance 64 being greater than second distance 68 prevent rotation in the direction of arrow 62 of support frame 18. In the preferred embodiment, object 58 may be a display screen for a laptop computer when support frame 18 is in second position 52, where second surface 60 is the front of the display screen and first surface 54 is the back of the display screen. FIG. 4 shows hinge member 16 comprised of a body 74 having a proximal end 76 and a distal end 78. A pivot element 80 at proximal end 76 of body 74 rotatably attaches camera 12 to body 74 so the camera may rotate about first axis 26 relative to body 74. A hinge element 82 at distal end 78 of body 74 hingedly attaches body 74 to support frame 18 so body 74 rotates about second axis 32 relative to support frame 18. FIG. 4 further shows camera 12 having an electrical wiring harness 84 to couple from an interior 86 to an exterior 88 of camera 12. Pivot element 80 has a bore 90 parallel to first axis 26 to receive electrical wiring harness 84 to pass wiring harness 84 from interior 86 to exterior 88 of camera 12. While the embodiments shown in the drawing figures and discussed herein illustrate a wiring harness 84 passing through a bore 90 parallel to first axis 26, it will be understood that other embodiments are contemplated. For example, wiring harness could enter body 74 at a location angularly spaced upward from bore 90.

FIGS. 5–7 show various perspectives of a third mode of the preferred embodiment of the present invention. FIG. 5 is a side view, FIG. 6 is a detailed side view showing the lens of the camera being fitably received by the cover, and FIG. 7 is a front view. The third mode of the preferred embodiment of the present invention is shown when camera 12 is rotated about second axis 32 along the direction shown by arrow 34 in a direction from the first front support element 40 and the second front support element 42 towards rear support element 38 of support frame 18. This rotation is continued in the third mode until camera 12 is in a position between rear support element 38 and first front support element 40 and second front support element 42. In this

position, distal end 41 of first support element 40 and distal end 43 of second front support element 42 slidably and fittably engage first indentation 25 and second indentation 27 respectively of housing 20 at housing backside 24. Camera 12 is then releasably held between rear support element 38 and first front support element 40 and second front support element 42. Rear support element 38 further has means to protect a lens 22 of camera 12, which is cover 90. Cover 90 is mounted at a distal end 92 of rear support element 38. Lens 22 of camera 12 faces in the direction of arrow 92, which is the direction of rotation about second axis 32 from first front support element 40 and second front support element 42 to rear support element 38 of support frame 18. Cover 90 fitably receives lens 22 of camera 12. Cover 90 has a raised portion 95 sized to be accommodated by lens 22 of camera 12. Support frame 14, in a third mode of the preferred embodiment of the present invention, releasably holds and protects camera 12 during storage.

FIG. 3 is a detailed front view of the camera clip invention. FIG. 3 shows first front support element 40 and second front support element 42 being spaced a distance apart by a distance 94. Camera 12 further has a housing 20 which may be spherical in shape in the preferred embodiment. Housing 20 has a diameter shown as distance 96, wherein the preferred embodiment, distance 96 is greater than distance 94. When camera 12 is rotated about the second axis 32 in the direction towards rear support element 38 in the direction of arrow 92 so that housing 20 passes between first front support element 40 and second front support element 42, first front support element 40 and second front support element 42 resiliently and outwardly flex to accommodate passage of housing 20. Housing 20 is releasably held once passing between first front support element 40 and second front support element 42 by rear support element 38 engaging housing 20 at lens 22 and distal end 41 of first front support element 40 and distal end 43 of second front support element 42 slidably and fittably engaging first indentation 25 and second indentation 27 respectively of housing 20 at housing backside 24. When housing 20 is releasably held, first front support element 40 and second front support element 42 resiliently urge housing 20 towards rear support element 38 so that lens 22 of camera 12 is fitably received into cover 90.

Having thus described the preferred embodiments of the present invention, those of skill in the art will readily appreciate that yet other embodiments may be made and used within the scope of the claims hereto attached.

What is claimed:

1. Apparatus for supporting a camera, having a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface and an edge intersecting the first surface and the second surface, comprising:

    a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member; and

    b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, said support frame having a first disposition positioned on said generally horizontal, substantially

5,855,343

**7**

planar surface, and said support frame having a second disposition attached to the object when said first surface and said second surface are inclined from a generally horizontal orientation, the camera being maintained adjacent said edge in said second disposition of said support frame.

2. Apparatus according to claim 1 wherein the support frame comprises a first portion and a second portion, the support frame being in the first disposition on the generally horizontal, substantially planar surface when distal extremities of said first portion and said second portion are engaging the generally horizontal, substantially planar surface, and the support frame being in the second disposition on the object when said first portion is engaging the first surface and said second portion is engaging the second surface, said first portion and said second portion in combination maintaining the camera adjacent the edge.

3. Apparatus according to claim 2 wherein the support frame includes a cover adapted to protect the camera lens when the camera is rotated about the second axis until the camera is between the first portion and the second portion.

4. Apparatus according to claim 3 wherein the first portion of the support frame further includes said cover, said cover being mounted at the distal end of the first portion and adapted the lens of the camera.

5. Apparatus according to claim 2 wherein the support frame is in the first disposition when the first portion and the second portion engage the generally horizontal, substantially planar surface at three or more locations in a common plane, thereby preventing rotation of the support frame relative to the generally horizontal, substantially planar surface in any direction.

6. Apparatus according to claim 2 wherein the support frame is in the second disposition when a first distance from the edge to a location where the first portion engages the first surface is greater than a second distance from the edge to a location where the second portion engages the second surface, thus preventing rotation of the support frame.

7. Apparatus according to claim 1 wherein the object is a display screen for a laptop computer, and the second surface is the front of the display screen and the first surface is the back of the display screen.

8. Apparatus according to claim 1 wherein the hinge member includes a body having a proximal and a distal end, a pivot element at said proximal end of said body adapted to rotatably attach the camera to the body so that the camera rotates about the first axis relative to the body, and a hinge element at said distal end of said body hingedly attaching said body to the support frame so that said body rotates, about the second axis, relative to the support frame.

9. Apparatus according to claim 8 wherein the pivot element has a bore along the first axis of rotation to receive an electrical wiring harness and pass said wiring harness to the camera.

10. Apparatus for supporting a camera, having a housing and a lens, on any generally horizontal, substantially planar surface and on an object having a first surface and a second surface, and an edge intersecting the first surface and the second surface, comprising:

 a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation relative to said hinge member; and

 b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the surface and the object, said hinge member rotating about a second axis of rotation relative to said support

**8**

frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported on the object, the support frame having a rear support element and a first and a second front support element, said support frame having a first disposition positioned on said generally horizontal, substantially planar surface when said rear support element and said first and second front support elements are engaging said generally horizontal, substantially planar surface, said support frame having a second disposition attached to the object when the first surface is inclined from a substantially horizontal position so that an uppermost extremity of the object is the edge, the support frame being maintained in said second disposition by said rear support element engaging said first surface and said first and second front support elements engaging the second surface, said rear support element and said first and second front support elements in combination preventing rotation of the support frame.

11. Apparatus according to claim 10 wherein the support frame adapted to protect the camera when the camera is rotated about the second axis towards the rear support element of the support frame until the camera is between the rear support element and the first and second front support elements, and is releasably held between the rear support element and the first and second front support elements.

12. Apparatus according to claim 11 wherein the first and second front support elements are spaced a distance apart, and wherein said distance is less than a diameter of the housing of the camera so that as the camera is being rotated about the second axis in the direction towards the rear support element, said housing passes between the first and second front support elements and the first and second front support elements resiliently flex outwardly to accommodate passage of said housing, said housing being releasably held once passing between the first and second front support elements by the rear support element engaging said housing at the lens.

13. Apparatus according to claim 11 wherein the first portion of the support frame further has a cover, said cover being mounted at a distal end of the rear support element and adapted to receive the lens of the camera when the camera is releasably held between the rear support element and the first and second front support elements.

14. Apparatus according to claim 10 wherein the support frame is in the first disposition when the rear support element and the first and second front support elements engage the generally horizontal, substantially planar surface at three or more locations in a common plane of the generally horizontal, substantially planar surface to prevent rotation of the support frame relative to the generally horizontal, substantially planar surface.

15. Apparatus according to claim 10 wherein the support frame is in the first disposition positioned on the generally horizontal, substantially planar surface when the rear support element and the first and second front support elements engage the generally horizontal, substantially planar surface to prevent rotation of the support frame relative to the generally horizontal, substantially planar surface.

16. Apparatus according to claim 10 wherein support frame is in the second disposition when a first distance from the edge to a location where the rear support element engages the first surface is greater than a second distance from the edge to a location where the first and second front support elements engage the second surface, the first dis-

**9**

tance being greater than the second distance thus preventing rotation of the support frame.

**17.** Apparatus according to claim **10** wherein the hinge member includes a body having a proximal and a distal end, a pivot element at said proximal end of said body adapted to rotatably attach the camera to the body so that the camera rotates about the first axis relative to the body, and a hinge element at said distal end of said body hingedly attaching said body to the support frame so that said body rotates about the second axis relative to the support frame.

**18.** Apparatus according to claim **17** wherein the pivot element has a bore along the first axis of rotation to receive said electrical wiring harness and pass said wiring harness to the camera.

**19.** A camera clip for supporting a camera on a laptop computer, the laptop computer having a display screen which can be inclined from a generally horizontal position, an uppermost portion of the display screen defining an edge, comprising:

a. a hinge member adapted to be rotatably attached to the camera, said camera rotating about a first axis of rotation relative to said hinge member;

and

b. a support frame hingedly attached to said hinge member to engagingly support said hinge member on the display screen, said hinge member rotating over a second axis of rotation relative to said support frame, the camera being maintained adjacent the edge, rotation of said support frame being prevented along an axis substantially parallel to said second axis where said second axis is substantially parallel to said edge.

**20.** Apparatus for supporting a camera having a lens on a substantially level surface, comprising:

a. a hinge member adapted to be rotatably attached to the camera, the camera rotating about a first axis of rotation relative to said hinge member; and

b. a support frame rotatably attached to said hinge member and configured to support said hinge member on a generally horizontal, substantially planar surface, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the generally horizontal, substantially planar surface when said hinge member is supported on the generally horizontal, substantially planar surface, said

**10**

support frame having a first portion and a second portion wherein said support frame protects the camera when said hinge member is not supported on the generally horizontal, substantially planar surface, and when the camera is rotated around said second axis in a direction from said second portion towards said first portion of said support frame until the camera is between said first portion and said second portion and is releasably held between said first portion and said second portion.

**21.** Apparatus for supporting a camera, having a lens, on an object having a first surface and a second surface, wherein a thickness measured between the first surface and the second surface defines an edge therebetween, comprising:

a. a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so adapted, rotating about a first axis of rotation relative to said hinge member; and

b. a support frame rotatably attached to said hinge member and configured to support said hinge member on the object, said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation, said second axis of rotation being substantially parallel to the first surface when said hinge member is supported by said support frame on the object, said support frame supporting said hinge member on the object when said first surface is inclined from a substantially horizontal position, the camera being maintained adjacent the edge when an uppermost extremity of the object is the edge, rotation of said support frame being precluded about an axis substantially parallel to said second axis, said second axis being substantially parallel to said edge, said support frame having a first portion and a second portion wherein said support frame releasably holds and protects the camera when said hinge member is not supported by said support frame on the object and the camera is rotated around said second axis in a direction from said second portion towards said first portion of said support frame until the camera is between said first portion and said second portion and is releasably held between said first portion and said second portion.

\* \* \* \* \*




Home

Contact Us

**One Sansome Street, 35th Floor**
**San Francisco, CA 94104**
**Telephone: (415) 217-8383**
**Facsimile: (415) 339-0593**
**Email: tomsmegal@smegallaw.com**

### Education:
J.D., George Washington University Law School, cum laude (1961)
Distinguished Alumnus 1995
B.S.Ch.E., Michigan College of Mining & Technology (1957)

### Admitted:
California (1963), Virginia (1961), District of Columbia (1962), United States Supreme
Court (1965), Court of Appeals for the Federal Circuit (1982), Ninth Circuit Court of
Appeals (1963), United States District Courts for the Northern, Eastern, Central and
Southern Districts of California, and registered to practice before the U.S. Patent and
Trademark Office (1962)

### Professional Experience:
Thomas Smegal specializes in providing expert witness testimony – and acting as an
arbitrator, mediator or special master – in intellectual property disputes. Mr. Smegal has
been a frequent lecturer on intellectual property law and litigation at the Center for
American and International Law and the Tuck School of Business at Dartmouth, as well
as in educational seminars sponsored by the state and national intellectual property law
associations.

Mr. Smegal was a partner in the San Francisco office of Knobbe, Martens, Olson & Bear
from 1998, when he opened that office, through 2005. Prior to joining Knobbe, Martens,
Olson & Bear, Mr. Smegal was a senior partner in charge of the intellectual property
department at the San Francisco law firm of Graham & James (1992-1998). From 1965-
1992, Mr. Smegal was a San Francisco partner in Townsend and Townsend, serving as
their first managing partner from 1974 until 1989. Prior to joining Townsend & Townsend,
Mr. Smegal had been a patent attorney with Shell Development Company in Emeryville,
California.

During the past 43 years, while engaged in the full-time practice of intellectual property
law, Mr. Smegal has prepared and prosecuted over a thousand U.S. patent and
trademark applications, rendered hundreds of infringement and validity opinions
regarding U.S. patents, participated as lead trial counsel in United States District Court
trials involving patent validity and infringement and has served as an arbitrator, mediator,
special master and expert witness in many intellectual property disputes.

### Public Service:
Mr. Smegal has been nominated by two presidents to serve on the Board of Directors of
the Legal Services Corporation. His 1984 nomination by President Reagan,
unanimously confirmed by the United States Senate, resulted in Mr. Smegal's service on
the eleven-member Board through 1989. His nomination by President Clinton in 1993,
again following unanimous United States Senate confirmation, resulted in Mr. Smegal's
second term of service on the Board through 2003. In recognition of his life-long
dedication to delivering legal services to the indigent, the National Legal Aid and
Defender Association honored him in 1987 as the recipient of its prestigious Arthur Von
Breson Award.

### Association Involvement:
In national organizations relating to the practice of intellectual property law, Mr. Smegal




EXHIBIT
**4**



was President of the American Intellectual Property Law Association (1986); Chair of the American Bar Association Section of Patent, Trademark and Copyright Law (1990-1992), President of the Board of Directors of the International Association of Intellectual Property Lawyers (1995-2001); on the Advisory Committee of the Court of Appeals for the Federal Circuit (1991-1997); Chair of the Board of Directors of the National Council of Intellectual Property Law (1988); and President of the National Inventors Hall of Fame Foundation (1987). In California, Mr. Smegal served as President of the Patent Law Association of San Francisco (1974); and Chairman of the Patent, Trademark and Copyright Section of the California State Bar (1979-1980).

Mr. Smegal served on the American Bar Association (ABA) Board of Governors, as its member representing the lawyers of California (1994-1997); in its House of Delegates (1987-2001); and as Chair of the ABA Section Officers Conference (1992-1994).

Mr. Smegal was President of the Bar Association of San Francisco (1979); President, Board of Directors of the Legal Aid Society of San Francisco (1982-1984); President, San Francisco Bar Association Foundation (1976); and President, San Francisco Institute of Criminal Justice (OR Project).

From 1985-1987, Mr. Smegal was one of fifteen elected lawyers members of the Board of Governors of the State Bar of California, serving as Vice President in his final year. He was also a member of the California State Bar Conference of Delegates Executive Committee (1981-1984).

**Representative Publications:**
Mr. Smegal is the author of the following articles, "Management of an Intellectual Property Law Organization," American Patent Law Association Professional Development Program, January 1979; "Tax Considerations Relevant to Domesitc and International Transfer of Industrial Property Rights," Practising Law Institute: Technology Licensing, Volume e, 1982; "Industrial Property/La Propriete Industrielle," World Intellectual Property Organization magazine, Special Issue, October 1982; "Exporting Patent Litigation to China," The San Francisco Attorney, August/September 1987; "Proving Commercial Success - Is Nexus Still Required?" American Intellectual Property Law Association, Continuing Legal Education Institute, January 1989; "High Court Considers Trade Dress Issues," The National Law Journal, April 27, 1992; "Legality of 'Interim Copying' is Disputed," The National Law Journal, July 6, 1992; "Federal Circuit CLarifies Laches Defense," The National Law Journal, September 28, 1992; "Inequitable Conduct, Caches and Estoppel," Practising Law Institute, November 1992; "The Misuse Defense in Copyright Litigation," The National Law Journal, February 15, 1993; "Questions Persist on Security Interests," The National Law Journal, June 28, 1993; "Russian Software: New Laws, New Risks," The National law Journal, September 13, 1993; "The Current Re-Examination Process for Compton's NewMedia Patent May Redefine and Substantially Limit the Company's...," The National Law Journal, April 4, 1994; "By Taking Precautions Sellers of CD ROMS and Multimedia Products Can Minimize the Risks in Using Public Domain Works," The National Law Journal, June 1994; "Proposed Amendments to the Copyright Act Would Address Concerns Raised by the Emergence of the National Information Infrastructure", The National Law Journal, November 7, 1994; "A Licencee's Rights in an Original Work that Secures a Loan Will Hinge on Whether and When the Security Interest was Properly Perfected", The National Law Journal, March 6, 1995.; "Access to Justice - The Critical Issue for the ABA", George Washington Magazine, November 1996; "Trade Secrets in the United States", Patent World, October 1998 Issue 106